KATHLEEN McNALLY *ET AL.*, PLAINTIFFS-APPELLANTS-CROSS-RESPONDENTS, v. TOWNSHIP OF TEANECK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT-CROSS-APPELLANT.

Argued May 9, 1977—Decided October 17, 1977.

34

*Mr. Howard M. Kaplan* argued the cause for appellant-cross-respondents.

*Mr. C. Conrad Schneider* argued the cause for respondent-cross-appellant (*Messrs. Schneider, Schneider and Behr,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. The Township of Teaneck, pursuant to *N. J. S. A.* 40:56-1, which authorizes a municipality to assess lands benefited by a local improvement, levied special assessments against 313 residential properties for reimbursement of the costs of paving streets and installing curbs. Owners of 74 properties appealed[1] asserting that the criteria used in determining the amounts of the assessments were improper. The Superior Court vacated the assessments and remanded the matter to the Township for reassessment. 132 *N. J. Super.* 442 (Law Div. 1975). On appeal the Appellate Division, while retaining jurisdiction, remanded the cause to the trial judge to reassess each property. The matter is before us by virtue of our having granted motions for leave to appeal by the plaintiff landowners and defendant Township.

The detailed facts are set forth in the trial court's decision. For purposes of this opinion a summary of the pertinent facts is in order.

In March 1971 the Township adopted an ordinance providing that new paving and new curbs would be installed on parts of eleven streets located in three residential areas. These were designated as local improvements, the cost to be assessed upon the lands in the vicinity of the improvement in accordance with *N. J. S. A.* 40:56-1 *et seq.* The ordinance also stated that the assessments "shall in each case be as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement. The total amount of the assessments so levied shall not exceed the cost of said improvement. The portion of such cost which shall not be so assessed shall be paid by the Township as in the case of a general improvement which is to be paid for by general taxation."

---

[1] One of these appeals was dismissed during trial.

Upon completion of the project the Township appointed three residents of the municipality as commissioners to assess property owners for such improvement. *N. J. S. A.* 40: 56–22. The chairman, Norman F. Sirianni, had previously served on eight to ten assessment commissions. He was a businessman and was president of a company which mined and marketed industrial sand. Julian Jerome Case, a member of the bars of New York and New Jersey, had 35 years experience in the real estate field as an owner, attorney, and instructor in real estate assessments and taxation. James R. Wynn, who did not testify at the trial, was an attorney and an accountant.

The total project costs consisted of $331,280 for the street paving, $12,105 for the curbing, and 7% overhead. These costs were itemized by streets and were furnished to the commissioners by the Township Engineer, Milton Robbins. The respective street costs varied depending upon such factors as the soil condition and size of the street. The accuracy and reasonableness of these figures are not in dispute.

Proposed assessments were calculated on a front-foot basis, that is, the total cost on a particular street was divided by the total foot frontage and the resultant figure multiplied by the foot frontage of each property. Thereafter, each commissioner visually inspected the improvements and the properties. After having satisfied themselves that the improvements were properly installed, checking the layout of each property on the municipal tax map and considering whether any special circumstances existed, the commissioners compared the allocated cost per property with the increased value in the land. The commissioners met on numerous occasions and held two public meetings with the property owners, some of whom appeared and voiced their objections to the proposed assessments. The commissioners concluded that in each instance the cost of the improvement did not exceed the enhanced value of the property.

In September 1973 the commissioners submitted a report to the Township Council setting forth the proposed assess-

ments and including a map showing the real estate bene-
fited. After holding a hearing at which some property own-
ers appeared, the Council confirmed the assessments with
two modifications. The front footage on one property which
had been miscalculated was corrected and a street paving
cost on one street was adjusted.

In their complaint the landowners asserted that the as-
sessments were improper because "there was no attempt
made to assess for the peculiar benefits" to each property
as a result of the improvement. They sought the return of
any monies which had been paid and a restraint to enjoin the
Township from assessing the plaintiffs on any basis other than
the peculiar benefits or increased value received. In the pre-
trial order the plaintiffs' factual and legal contentions were
that the assessment commissioner did not attempt to identify
precisely the peculiar benefit, advantage or increase in value
which accrued to each property and that *N. J. S. A.* 40:56-
27, which restricts each individual assessment to the benefit,
advantage or increase in value received, had been violated.

At the trial Commissioners Sirianni and Case testified,
along with two realty appraisal experts, one for each party.
Additionally, the deposition of Commissioner Wynn was ad-
mitted into evidence. The trial judge rejected the plaintiffs'
expert and accepted the testimony of the defendant's expert,
Joseph W. Burek. We believe she was fully justified in so
doing.

Mr. Burek had been in charge of the Teaneck revaluation
in 1970 and was familiar with the streets involved before the
improvement. He examined the properties after the improve-
ments and considered all available sales data. He fixed the
market value of each parcel and the dollar enhancement at-
tributable to the paving and curbing. Based on this data
with respect to 22 of the properties, he found that the as-
sessments exceeded the pecuniary benefits in varying amounts
and that they were equal to or less than the market value en-
hancement of the remaining 51 parcels. His findings are sum-

marized in an appendix attached to the trial judge's opinion. 132 *N. J. Super.* at 462–463.

The trial judge, holding that use of a front-foot formula dependent on a cost basis is improper, rejected the method utilized by the assessment commissioners, asserted that there was unlawful discrimination among property owners, and remanded the assessments appealed from to the Township for reassessment. The Appellate Division, holding that the amount of a special assessment may not exceed the quantum of the enhanced value, was not certain as to the standards the trial judge would impose in fixing the assessments. Apprehensive that the assessment commissioners would be unable to comply with the trial court's order, the Appellate Division, while retaining jurisdiction, remanded the cause to the trial judge to reassess each property.

Municipalities are authorized to undertake the paving or repaving of a street and the curbing of a sidewalk along a street as local improvements. *N. J. S. A.* 40:56–1d. and e. By definition a local improvement is one the cost of which in whole or in part "may be assessed upon the lands in the vicinity thereof benefited thereby." *N. J. S. A.* 40:56–1. The governing body may in the ordinance authorizing a local improvement provide that a part of the costs be paid by the municipality. *N. J. S. A.* 40:56–12. Particular assessments may be made either by the tax assessor or board charged with the duty of making general assessments or by a board created for that purpose. *N. J. S. A.* 40:56–21. In the absence of a board, the governing body may appoint by resolution "three discreet freeholders, residents of the municipality, in no way interested in the improvement, as commissioners to make the assessments for benefits for such improvement." *N. J. S. A.* 40:56–22.

Upon completion of any local improvement, whoever is in charge "shall certify" to the commissioners a statement showing in detail the cost of improvement and the amount, if any, paid or contributed by the municipality. *N. J. S. A.* 40:56–24. If the assessments do not equal the cost less the

contribution, the balance must be paid by the municipality. *Id.*

The commissioners are charged with examining the improvement and viewing all lands and real estate "upon the line and in the vicinity thereof benefited thereby . . . ." *N. J. S. A.* 40:56–25. They must also hold a public hearing, after notifying the affected property owners by mail and by publication in a newspaper. *Id.* Witnesses may be examined under oath and the commissioners may "make a just and equitable assessment of the benefits conferred upon any real estate by reason of such improvements having due regard to the rights and interests of all persons concerned, as well as to the value of the real estate benefited." *N. J. S. A.* 40:56–26.

Certain guidelines are statutorily mandated. The total amount of the assessment levied cannot exceed the total project cost less any municipal contribution. *N. J. S. A.* 40:56–24. Further, all assessments are to be "as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement." *N. J. S. A.* 40:56–27. If the total cost exceeds the assessments, the municipality must pay the difference. *N. J. S. A.* 40:56–37. The commissioners then submit a report in which the assessments are itemized to the governing body of the municipality. *N. J. S. A.* 40:56–30. Before approving the assessments, the governing body must consider the report at a public meeting, notice having been given by mail to the affected property owners and by newspaper publication. *Id.* After considering the report, the governing body is empowered to adopt and confirm the assessments with or without alterations. *Id.* Within 30 days thereafter a property owner may appeal to the Superior Court. *N. J. S. A.* 40:56–54. Upon review the court presumes that the assessments were regularly made and confirmed, *N. J. S. A.* 40:56–33, and determines whether the assessment is "just and fair." *N. J. S. A.* 40:56–54. If not, the court

"shall make an order correcting the same . . .". *Id.* The commissioners then are required to assess anew the benefits which become a lien upon the property. *N. J. S. A.* 40:56-34. If an assessment has been illegally made and paid, and the new assessment is for a lesser amount, the municipality must refund the difference. *Id.*

The key issue in this case is whether utilization of cost per front-foot basis, when employed in conjunction with the judgment of commissioners based upon their visual observations and examinations of each property and their individual experiences, is appropriate in fixing assessments for paving streets and installing curbs in a residential neighborhood.

Use of the cost per foot frontage formula has been constitutionally sustained. *Webster v. Fargo,* 181 *U. S.* 394, 21 *S. Ct.* 623, 45 *L. Ed.* 912 (1901). It has long been embedded in our history as an appropriate tool for commissioners to use. See *State, Kohler, pros., v. Town of Guttenberg,* 38 *N. J. L.* 419 (Sup. Ct. 1876), where Justice Dixon wrote that:

It is their [commissioners'] duty to consider, specifically, the advantage accruing to each plot, but on such consideration, they may judge that because of the uniform condition of the land, every foot of frontage is equally increased in value. Upon such a conclusion, the frontage would, of course, fix the proportion of burden. [*Id.* at 422-423]

In *Wilson v. Ocean City,* 112 *N. J. L.* 97 (E. & A. 1934), aff'g *per curiam* o. b. 11 *N. J. Misc.* 325, 165 *A.* 880 (Sup. Ct. 1933), the Court of Errors and Appeals adopted the opinion of the former Supreme Court, which, rejecting an attack on cost per foot frontage assessments, wrote:

The law is settled that an assessment on a frontage basis will not be set aside if that basis appears to be a fair test for the estimation of benefits. [11 *N. J. Misc.* at 326, 165 *A.* at 880]

*See Dooling v. Ocean City,* 67 *N. J. L.* 215 (Sup. Ct. 1901); *Raymond v. Rutherford,* 55 *N. J. L.* 441 (Sup. Ct.), aff'd

*per curiam* 56 *N. J. L.* 340 (E. & A. 1893); *In re South Orange,* 2 *N. J. Misc.* 867 (Cty. Cir. Ct. 1924). It has likewise been sanctioned in many other jurisdictions. *See* Annot., "Assessments for improvements by the front-foot rule," 56 *A. L. R.* 941 (1928) (listing 23 states other than New Jersey which have upheld the validity of assessments in which the cost per foot frontage has been utilized).

■ Whether the property subject to assessment has been benefited and, if so, the extent thereof are factual issues. The ultimate test is, of course, the difference between the market value of the land before and after the improvement. *McQueen, et al. v. Town of West New York,* 56 *N. J.* 18, 23–24 (1970); *In re South Orange,* 2 *N. J. Misc.* 867, 868–869 (Cty. Cir. Ct. 1924). That difference, the incremental value, may be established by the conventional method of expert testimony or by some other reliable proof. *McQueen, et al v. Town of West New York,* 56 *N. J.* at 24.

■ The cost of the new pavement and curb is evidence of its value to the abutting property owner. In the absence of any proof to the contrary the enhancement in value presumably would be equated with that cost. That is comparable to the use of cost to ascertain increased market value for general tax assessments when an improvement is made to an existing structure. In that case, in the absence of other evidence, the value increase would usually be presumptively equivalent to the cost. Where the value of personal property has decreased, use of the cost of repairs has been held to be sufficient in itself to establish damages. *Moeller v. Weston Trucking & Forwarding Co., Inc.,* 136 *N. J. L.* 643, 644 (Sup. Ct. 1948). This principle has been applied in ascertaining damages to realty. *Berg v. Reaction Motors Div.,* 37 *N. J.* 396, 411–412 (1962); *525 Main Street Corp. v. Eagle Roofing Co.,* 34 *N. J.* 251, 254–255 (1961). We envision no reason why the same principle should not be applied to measure increases in value. This approach is sensible and practical. Moreover, this approach in the context of special assessments for street pavements and curbs where the com-

missioners have made the necessary inspections and determinations operates effectively to bring about fair and equitable results.

Exaction of more than the special benefit to the property owner would constitute a taking of private property for public use without compensation. *Norwood v. Baker,* 172 *U. S.* 269, 19 *S. Ct.* 187, 43 *L. Ed.* 443 (1898); *The Tidewater Company v. Coster,* 18 *N. J. Eq.* 518, 526–531 (E. & A. 1866). So, if it is shown that the market value enhancement is less than cost, then the assessment must be reduced accordingly. This is somewhat analogous to the situation involving property damages where the difference between market value before and after the event acts as a recoverable ceiling even though the cost of repair may exceed that amount. *Parisi v. Friedman,* 134 *N. J. L.* 273, 274 (E. & A. 1946).

The two statutory ceilings that the total assessments may not exceed the total costs and that the individual assessment must not be in excess of the enhanced value assure property owners that they will not be charged more than a fair share of the improvement cost. *State, Agens, pros., v. Mayor, etc., of Newark,* 37 *N. J. L.* 415, 422–423 (E. & A. 1874). In this manner the assessments will not be in excess of the peculiar benefit to a particular property, *N. J. S. A.* 40:56–27, even though as a result property owners may pay, *inter se,* varying amounts. The statute, *N. J. S. A.* 40:56–27, refers to the relationship of the betterment to each owner's property and not to the relationship among property owners.

The special assessment is not a tax which comes within the constitutional provision requiring that property be assessed for taxation under general laws and by uniform rules. *N. J. Const.* (1947), Art. VIII, § 1, par. 1; 14 McQuillin, *Municipal Corporations* § 38.01, at 10–11, § 38.05, at 34 (3d ed. 1970). The purpose of a special assessment is to reimburse the municipality in whole or in part for a particular expenditure. The scheme of the local improvement law makes it abundantly clear that its function is not to

raise funds for revenue purposes. *See generally Salomon v. Jersey City,* 12 *N. J.* 379 (1953). The ordinance, authorized by statute promulgated under the State's police power, simply created a method of levying assessments on those who have received a special benefit from the expenditure. *State, Agens, pros., v. Mayor, etc., of Newark,* 37 *N. J. L.* 415 (E. & A. 1874).

The commissioners here were well qualified to perform their functions. Their collective experiences included service on prior commissions, operation of a business, practice as an attorney and accountant, ownership and operation of realty holdings, and instruction in courses on real estate appraisal and taxation. Judge Mountain in *In re South Orange, supra,* 2 *N. J. Misc.* at 869, approvingly quoted a judicial pronouncement that: "They [commissioners] are expected to act on their own opinion as citizens of experience and intelligence with the aid of such information as they are able to gather." These commissioners complied with all the statutory requisites. They viewed the properties affected to determine whether there were any circumstances which would warrant a different treatment of any particular property or whether they were all substantially the same. They afforded the property owners an opportunity to be heard and to present evidence, expert or otherwise, to demonstrate the lack of uniformity or unusual nature of their property as well as proof that the assessment exceeded the difference between the market value before and after completion of the project. The property owners adduced no such evidence, expert or otherwise.

The record reveals that the commissioners certified and reported that the assessments were as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective parcels of real estate received by reason of the improvements. The contents of the report are presumptively correct and the taxpayers had the burden of overcoming that presumption by clear and convincing evidence. *In re Public Service Elec-*

*tric and Gas Co.*, 18 *N. J. Super.* 357, 364 (App. Div. 1952) ; *Graham v. Ocean City*, 98 *N. J. L.* 426, 429 (Sup. Ct. 1923).

The expert Burek's testimony, accepted by the trial court, established that the enhancement in market value for certain properties was less than the assessed proportionate cost.[2] We conclude that it therefore satisfied those taxpayers' burdens of overcoming the presumption. However, the presumption was not overcome as to the remaining properties. As indicated above, use of the cost per front-foot formula for pavement and curbs by the commissioners who viewed the improvements and each of the properties and applied their own judgment and expertise adequately established the incremental values, there being no indication in the record that the parcels on a per street basis lacked substantial uniformity. Those findings are buttressed by the expert's testimony that the increased values and benefits to each of these properties were equal to or exceeded the assigned costs of the pavement and curbs.

The trial court invalidated these assessments (even though the benefits exceeded those assessments) because of the widely differing percentages among the 73 properties of the ratios of their respective assessments to incremental value and assessments to value of the real estate before the improvement. 132 *N. J. Super.* at 458. This rationale raised *sua sponte* by the trial court rests upon some underlying misconceptions.[3] First, imposition of the special assessment is not a general tax which constitutionally requires uniformity. *N. J. Const.* (1947), Art. VIII, § 1, par. 1. The special assessment is a means of reimbursing a municipality for

---

[2]The record indicates that 22 properties, rather than 18 as stated by the trial court, are in this category.

[3]The plaintiffs' theory at trial was twofold. First, that the cost per foot frontage method was erroneous and, second, that paving a road created no benefit to the properties. The plaintiffs never claimed that their respective assessments were too high because of the inadequacy of other assessments.

a capital expenditure which was specially advantageous to certain properties. Second, the statute does not call for a comparison of benefits among property owners. *N. J. S. A.* 40:56–27. Third, the costs of the improvement allocable to each property do not necessarily result in the same percentage of increased value of each parcel. For example, assume pavement costs of $2500 each for a $25,000 and a $50,000 home on comparable adjoining lots. Though the value increase of both properties may be the same, the percentage increase in value of one would be 10% as compared to 5% for the other. So long as neither owner is required to pay more than the benefit received and the method of determining the amount of that benefit is reasonable and applied uniformly to all property owners, the statutory mandate has been satisfied.

Contrary to the trial court's expectation the ratios of the assessment to the realty value before betterment and of the assessment to the incremental value may vary widely.[4] Elimination of the divergence among plaintiffs in their assessment to before improvement value ratios, as suggested by the trial court, would require application of the lowest ratio of assessment to before improvement value to each of the 313 properties. This would effectively thwart the municipality's efforts to obtain reimbursement, result in a bonanza to many property owners who would be paying a lower percentage of the pro rata costs, and thrust the additional burden on all the municipality's taxpayers. Neither the statute nor the constitution calls for this.

Attempts to equalize the varying ratios of assessment to enhancement among plaintiffs might also produce anomalous effects. If one were to apply the lowest ratio to each property the same results as described above would occur. Or, if one were to assess at full benefit, certain property owners would be called upon to pay more than their allo-

---

[4]The trial court mistakenly assumed that assessments should be equal to incremental value.

cable cost of the improvement whereas others would pay less than their proportionate share. The commissioners applied the same front-foot formula to all properties, with due regard to any special circumstances affecting any particular parcel. There is no evidence that different ratios of allocated costs were applied. The same standards and criteria were applied to every property and the resulting special assessments arrived at did not violate any rights in an equal protection sense. Thus the method results in a balancing of costs and is a practical workable device for assessment commissioners.

Accordingly, the matter is remanded to the trial court to enter appropriate judgments directing reduction of assessments in those cases where the total assessment exceeded the enhancement value. The remaining assessments shall be confirmed.

Affirmed in part and reversed in part and remanded.

*For affirmance in part, reversal in part and remandment*— Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*Opposed*—None.